# RICHEY & GILBERT COMPANY v. NORTHERN PACIFIC RAILWAY COMPANY.[1]

April 1, 1910.

Nos. 16,375—(159).

**Shipper's Demand for Cars — Recovery for Refusal.**

Where the usual course of business has been for a railway company to furnish cars at a warehouse maintained by a shipper, the shipper has the right to demand cars for its use, giving reasonable notice of its requirements; and, if loss results because of a wrongful refusal or neglect to furnish the cars, the shipper may recover.

**Same — Tender of Merchandise.**

In such a case, the fact, particularly when communicated to the carrier, that the goods to be shipped are prepared for and immediately available for shipment, is a sufficient tender of the merchandise to the carrier.

**Action for Loss — Measure of Damages.**

An action for loss so occasioned is in tort; no contract having been made for delivery at any point. The measure of damages is the difference in value of the merchandise at the place of shipment, when offered for transportation, and its value at the same place, when shipping facilities were furnished.

[1]Reported in 125 N. W. 897.

---

[Note]   Duty of carrier to furnish cars to shipper, see note to Houston, E. & W. T. R. Co. v. Campbell (Tex.) 43 L.R.A. 225, and note to Di Gorgio Importing & S. Co. v. Pennsylvania R. Co. (Md.) 8 L.R.A. (N.S.) 108.

**Evidence — Verdict.**

Evidence considered and found to justify a verdict for a reduced amount.

Action in the district court for Hennepin county to recover $48,500 on fourteen causes of action for delay of defendant, as a common carrier, in furnishing refrigerator cars during the months of October and November, 1907, for the transportation of apples from the state of Washington. Defendant answered that it exercised due care, but was not able to furnish all the cars ordered by plaintiff at the times when they were ordered, on account of the unexpected rush of business and the unusual volume of traffic offered to it for transportation at that time; that it did furnish many cars before November 15; that it made a fair and equitable distribution of the cars it was able to furnish among the various shippers along the line. The reply was a general denial. The case was tried before Simpson, J., and a jury which returned a verdict in favor of plaintiff for $21,588. Defendant's motion for a new trial was granted unless plaintiff would accept a reduction of the verdict to $16,476, but if it consented, the motion was denied. Plaintiff consented. From the order denying defendant's motion, it appealed. Reversed unless plaintiff should consent that the verdict be reduced to the sum of $12,421.39, but that, if plaintiff should elect to consent to such reduction, the order denying a new trial be affirmed.

The trial court charged the jury, in part, as follows:

"Before any duty is imposed upon the railway company to carry with reasonable promptness goods, the goods must be properly offered for carriage. This usually involves tender and delivery of the goods to the railway company at a place it receives goods for shipment, and tendering them for shipment to some definite place, and if demanded, tendering payment of freight charges. These steps are ordinarily the necessary steps to be completed by the shipper in doing his part of making a completed shipment. But payment in advance or upon shipment may be waived by the carrier and it may not be an essential part of the offering or proper tendering of the goods for shipment. And as to the tender of delivery no particular form of such tender is required. It is claimed by the plaintiff

that the evidence establishes these facts in this case: That the plaintiff had in its warehouse at Toppenish and in orchards about there a total of 12,376 boxes of apples, about that number at least, which he desired to ship over defendant's line to many eastern points; that the plaintiff in good faith made seasonable orders for a specified and sufficient number of refrigerator cars for such shipment of these apples east from Toppenish; that plaintiff was ready at all times, when all such cars were ordered to be ready for loading, to load these apples on cars for shipment east over defendant's line and to designate points of destination and to pay freight if required; and that he repeatedly notified the defendant company of these facts; offered to place the apples on the platform for loading, and that the defendant company through its agents accepted such offer as sufficient tender on its part, on plaintiff's part, of the apples and requested the plaintiff not to place them on the platform. Now, if you find that these are the facts as to all these apples, then that would be a sufficient offer of all the apples for shipment, and the railway company would be charged with the duty of furnishing cars to transport the apples with reasonable promptness. And if these are the facts as claimed by the plaintiff as to any part of the apples, then as to such part of the apples such duty would arise.

"On the other hand if the plaintiff did not in fact have these apples ready for shipment so that he could or would have delivered them as rapidly as cars were furnished, had they been furnished promptly, or if he was not ready to designate places of destination so as to make definite shipment of the apples as rapidly as cars were ready to receive them, or if he did not notify the railway company of these facts and in good faith order these cars (which it is conceded in this case were ordered) for shipment of these particular apples from Toppenish, then in either such case as to such apples there was no duty on the part of the defendant company to furnish cars.

"Duties between the shipper and the carrier are reciprocal, and unless you find that the plaintiff was ready to perform and proffered performance of the things required by him to be done in making the shipment, then he cannot complain if the defendant failed or refused to perform the thing required to be performed by the carrier in making the shipment."

The duty of a railway company to furnish reasonable facilities for transportation and receiving and carrying the goods which may be proffered it "is not an absolute duty that the carrier is bound as an insurer to perform under all conditions, but it is the duty in the discharge of which it is bound to exercise ordinary reasonable skill and diligence. So where there is a sudden and unusual press of business arising from conditions which the company could not reasonably be expected to have anticipated, it is not liable for delay thereby necessitated. It is bound to provide facilities for such transportation only as might reasonably have been anticipated, and it is not bound to provide in advance for extraordinary occasions or for an unusual influx of business which is not reasonably to be anticipated. Further, a railway company is not only justified in furnishing all its customers equal facilities, but it is its duty to so do, and it is unlawful for it to furnish one shipper facilities not granted to another under the same circumstances. So where a carrier furnishes sufficient facilities for all the business which might reasonably have been anticipated or expected, but through some emergency such facilities are inadequate, then its means of transportation must be distributed at its various stations so as to furnish as fairly as may be equal facilities to all."

"If you find that the delay should be accounted for by these different causes, then you should hold the railway company only for such delay as you find was occasioned by its fault, and it should not be held responsible for such delay as you find was necessitated by an excess of business, an unusual excess of business which it could not reasonably have been expected to anticipate."

"Any damage which plaintiff may have suffered in the handling of his apples, which cannot be traced to the failure of the railway company to perform its duty towards him as a proximate cause cannot be charged to the railway company. On the other hand, such damage as was caused the plaintiff, by the failure of the railway company to furnish such facilities as it could reasonably have anticipated were required, plaintiff is entitled to recover from the railway company."

"The second element under which it is claimed the plaintiff suffered damage is the damage chargeable against the defendant incident to a decline in prices. If a railway company by its fault delays a shipment, thereby causing a shipper to lose a favorable market as to price and so compels him to market or dispose of his apples after the price has declined, the railway company is chargeable with the resulting loss. Ordinarily this is readily determined by comparing the prices which the shipper would have obtained at the point of destination for his goods, if the goods had gone forward with reasonable promptness, comparing that with the price obtainable there at point of destination when they did actually arrive. In this case the principle to be applied is the same. You are required to determine fairly from the evidence what would have been received for the apples if they had been shipped with reasonable promptness, and what could be derived from them after the delay in so far as the element of fluctuation of price is involved in that inquiry. And that is the only element of damage we are now considering.

"The exact destination to which the different boxes of apples here involved were to be shipped was not determined or disclosed in connection with the proffer of shipment. But there is testimony in the case tending to show the markets to which the aggregate apples were to be shipped and the prices of these apples in such markets during all the times involved, together with the times ordinarily required to transport apples from Toppenish and North Yakima to these destinations, so that you can from the evidence fairly ascertain what would have been obtained for those apples had they been shipped with reasonable promptness to such destination and what could have been obtained for them after November 13 at such places." * * * "If you find from the evidence that the apples after November 13 were of greater value at Toppenish and North Yakima than at the said points of destination, then you will adopt that value as a basis for any estimate of decline in prices and resulting damage. Because as already stated the plaintiff is only entitled to recover its actual loss, and any method of computing damage that would give greater than the actual loss or damage would be improper."

*C. W. Bunn* and *Emerson Hadley,* for appellant.

The important question in this case is this: What kind of a demand or tender is it necessary for shipper to make in order to render the carrier liable for failure or delay in carrying the goods? Before the law can imply an acceptance of an offer to ship, there must be an offer and that offer must be such an offer as, if accepted, will amount to a contract binding upon both parties, for an implied contract of transportation must in order to amount to a contract bind both parties as much as any other contract. The reason why an offer or tender of goods is necessary at all is because it is that offer or tender on the part of the shipper, with the implied acceptance on the part of the carrier, that creates and defines the mutual obligations of the shipper and the carrier. Therefore the offer or tender must be sufficiently definite to create an obligation on the shipper to ship and on the carrier to carry some particular goods to some particular destination.

Can it be held that, when the plaintiff's manager at North Yakima requested the defendant to furnish cars to load with fruit to be shipped east, there was an implied contract on the part of the railroad company to carry apples in those cars to St. Paul or Chicago? Had the plaintiff offered to enter into a contract to ship them to St. Paul or Chicago or any other definite place? If the railroad company had replied when these orders were given it, "I accept your orders" and had set the cars at plaintiff's warehouse, would that have amounted to a contract of transportation binding upon the plaintiff to send its apples to any particular destination? Clearly not. And if an express acceptance would not create a contract for transportation, can there be any acceptance implied as a matter of law that will do any more?

The fallacy of the trial court's reasoning is that it assumes that the only purpose of a tender is to show the default of the carrier, whereas another important function of the tender in this instance is to create the relation of shipper and carrier and define the respective obligations of each, and until there is a tender which is sufficiently definite to indicate what those obligations are there can be no legal duty on either party.

The argument that it is unnecessary to make a specific tender of goods to a carrier when it is unable or unwilling to carry them, on the ground that it will do no good and the law will not require a useless thing to be done, is plausible, but it does not rest on sound reasoning when applied to a case of this kind. The answer to the argument is this: There is no duty or obligation on the part of the railroad to transport goods in general; indeed, it has no right to carry them until they are tendered and there is therefore no failure of duty until it has been requested to do some particular thing. When it has been requested to carry some definite goods to some particular destination and has done it negligently, or failed to do it entirely, then there is some definite fault or failure on its part which is capable of being measured.

It is not surprising that it is difficult to find direct authority on this proposition, because it is so unusual for a person to claim damages for delay in transportation of goods when they have not been tendered to any definite destination, and where the party himself does not know where he wanted to ship them, that we doubt if any such claim was ever before presented to a court. But see 4 Elliott, Railroads, § 1476; Missouri Pac. Ry. Co. v. Texas & Pac. Ry. Co., 31 Fed. 864; Little Rock v. Conatser, 61 Ark. 561; Wilder v. St. Johnsbury, 66 Vt. 636.

There is a well established rule of law governing the measure of damages for delay in the transportation of goods which should have been applied in this case. This rule is that where goods are intended for sale at destination, and they have been delayed by fault of the carrier and they have fallen in market price or depreciated in condition, because of the delay, the measure of damages is the difference in value of those particular goods at destination at the time when they should have arrived and their value when they did actually arrive. 3 Hutchinson, Carriers (3d Ed.) § 1366; Whalon v. Aldrich, 8 Minn. 305 (346).

There is another rule of damages that applies where a carrier refuses to carry goods properly offered for transportation to some definite destination. There the damage is the difference between the value of the goods at destination at the time they should have

arrived and the value at that time at the shipping point less the freight. 3 Hutchinson, Carriers (3d Ed.) § 1370; Cowley v. Davidson, 13 Minn. 86 (92). This rule was not applied in this case for the reason that there was no evidence of any refusal to carry. The whole claim of the plaintiff is based on delay in furnishing cars.

The court also erred in charging the jury that they could determine from the testimony the destinations to which the apples were to be shipped and ascertain what would have been obtained for them, if they had been transported to such destinations with reasonable promptness and compare that with what could have been obtained for them at those destinations after November 15. It is a well established rule that where a shipper intends to claim any special damages on account of delay in transportation of goods he must inform the carrier of circumstances that will cause such special damage when the transportation is undertaken; otherwise he can only recover general damages. 3 Hutchinson, Carriers (3d Ed.) § 1367.

*George C. Stiles* and *John P. Devaney,* for respondent.

A railway company is bound to provide facilities for such transportation as might reasonably be anticipated and in the ordinary course of business. It is not claimed or contended by the defendant or any of its witnesses, that the offer made by plaintiff to ship apples out of the Yakima valley in the fall of 1907 or its demand for cars at that time was unusual or surprising. The defendant was not without notice of the demand which would be made upon it in the fall of 1907. From its past experience in the handling of similar business, as well as from the fact that the agents along its line of railway had given it advance notice and information of the prospects and possible demands which would be made upon it, this notice being received as early as the spring of 1907, when the first crop indications were to be had, at which time the superintendent of transportation received advices as to crop conditions in the Yakima valley, it is to be presumed that in view of this advanced knowledge and information that the defendant kept in touch with the situation

in the valley from time to time while the apple crop was maturing, until October 1, when the first demands were made upon it for cars. in which to load and ship apples out of the valley.

There were no unusual or unnatural conditions prevailing at this time to prevent the defendant furnishing cars promptly, no storms, floods, riots or unexpected crop, but a railroad in perfect condition with extra large equipment.

The cause of the defendant's delay and the failure to furnish cars promptly to plaintiff were due to the negligence and carelessness of its officials and agents, their failure to assemble and send cars promptly in the regular course of business to the apple shipping territory, and to use reasonable means to care for this demand.

O'BRIEN, J.

Plaintiff is a fruit merchant in the state of Washington; its principal depots being at Toppenish, where it has a warehouse and trackage on or adjacent to defendant's right of way, and at North Yakima, where it has warehouse privileges of a similar nature.   This action is to recover for loss which plaintiff claims to have sustained through the failure of defendant to furnish it transportation facilities for certain apples which it desired to ship between October 10 and November 15, 1907.   The complaint contained fourteen causes of action, some of which are evidently duplications; but in the aggregate the complaint alleged failure to transport 60,450 boxes of apples, to plaintiff's damage in the sum of $48,500, an average of a fraction more than eighty cents per box.

The evidence contained in a record of 1,139 pages tends to show that on October 10, 1907, plaintiff notified defendant that it would require at Toppenish two cars per day, beginning with October 10 and continuing to October 31, except Sundays, and sixteen cars at North Yakima.   From some time in October, up to and until the early part of November, the plaintiff by letter and telegram frequently reiterated its demand for cars.   While several cars were furnished, they were insufficient to move all of the apples which plaintiff then had for shipment.   On November 13 plaintiff had the fol-

lowing apples packed in boxes, which it had been unable to ship because of the lack of facilities:

| | | |
|---|---|---|
| At Toppenish warehouse | 6,730 | boxes |
| In orchards (in vicinity of Toppenish) | 3,099 | " |
| Sunnyside and Granger (stations on defendant's road) | 2,547 | " |
| North Yakima | 10,121 | " |
| Total | 22,497 | boxes |

The plaintiff claimed (a) that the apples on hand November 13 had deteriorated while awaiting shipment; (b) that the fruit in five cars shipped in October had, because of delay, deteriorated in value; (c) that on November 15 the market price of apples suddenly and materially declined. It is, as we understand, conceded that sufficient facilities were furnished or tendered by defendant upon November 15, so that the period during which the damage is claimed to have occurred extends from October 10 to November 15. It appeared upon the trial that the total number of cars demanded by the plaintiff for North Yakima was sixteen, ten of which were furnished. The six cars lacking would have contained 3,900 boxes. The court submitted to the jury plaintiff's claims to the following:

| | | |
|---|---|---|
| Toppenish warehouse | 6,730 | boxes |
| In orchards | 3,099 | " |
| Granger and Sunnyside | 2,547 | " |
| North Yakima | 3,900 | " |
| Total | 16,276 | boxes |

In addition thereto the claim of deterioration on five cars shipped in October, amounting to $1,716.70. The jury found for the plaintiff in the sum of $21,588, which included interest to January 30, 1909. A new trial was ordered, unless the plaintiff consented to a reduction of the verdict to the sum of $16,476; the court deducting from plaintiff's claims any damages on account of the apples at

Granger and Sunnyside, and any claim for deterioration in the apples at North Yakima. The plaintiff consented to the reduction, and defendant appeals from the order denying a new trial. There is thus left for consideration plaintiff's claims as to 13,729 boxes, distributed as follows: Toppenish warehouse, 6,730; orchards, 3,099; North Yakima, 3,900; and the five carloads of apples shipped in October.

The errors assigned upon this appeal may be considered under the following heads: (1) Is the evidence sufficient to show a failure on the part of the defendant to furnish reasonable transportation facilities? (2) Does the evidence show a sufficient tender of the apples, and particularly as to those in the orchards at Toppenish? (3) Was the jury instructed as to the proper measure of damages? (4) Is the evidence sufficient to sustain the finding as to the amount of plaintiff's damage?

1. It is not contended that the defendant, prior to November 15, 1907, furnished the plaintiff with the cars demanded, or with those actually required by it. The defendant does insist, however, that it did all that could be reasonably expected of it. It appears that about October 1 defendant was notified of plaintiff's requirements. A great deal of evidence was introduced by both parties for the purpose of showing what cars were furnished, as well as what could have been furnished had defendant used due diligence. This question of fact was fully and fairly submitted to the jury, which determined the issue in plaintiff's favor.

2. The rights and duties of the parties to this controversy must be determined with reference to actual conditions and to the usual methods of transacting business, and a consideration of these leads unavoidably to the conclusion that the plaintiff had the right to demand cars for the shipment of its fruit, and that it made a sufficient tender of the apples upon which the verdict as reduced was based. It is not necessary to discuss defendant's duty as a common carrier to furnish to the public reasonable and ordinary facilities.

What are reasonable facilities depends upon the ordinary and usual course of business at the time to which the inquiry is directed. The plaintiff maintained a warehouse at or adjacent to defendant's right

of way at Toppenish, to which the defendant had extended trackage facilities. We do not understand, either from defendant's answer or the testimony, that there was anything unusual or improper in plaintiff's demand for cars, except as to the number demanded; but defendant claims that, because of the unexpected volume of business generally, it was unable to furnish a greater number of cars than it actually did. This can only mean that the reason all of these apples were not actually shipped before November 15 was because of defendant's failure to furnish cars, and its excuse for this failure is, not because of any conduct upon plaintiff's part, but because the general demand was so overwhelming that defendant was unable to do more than it did. The fruit was gathered, boxed, and ready for shipment, and any additional or other tender of it to the defendant could serve no useful purpose. Every merchant, as well as every producer, upon a line of railroad, is to a greater or less extent dependent upon it for an opportunity to carry on business, and when a merchant follows the usual and regular course in preparing for the shipment of merchandise, and in notifying the carrier of his requirements, it would, we think, be a grievous wrong to say that in addition he should go through the empty form of bringing each package to the defendant's freighthouse and demanding its immediate shipment.

This applies, not only to the warehouses at Toppenish and North Yakima, but also to the 3,099 boxes in the orchards in the immediate vicinity of Toppenish. These were also boxed and ready for shipment. The testimony indicates that the warehouse was completely filled shortly after October 10. Had the apples in the warehouse been shipped, those in the orchards would have immediately taken their place. The jury found that the defendant negligently failed to furnish the facilities which, under the circumstances, it was required to furnish, and we conclude the plaintiff may recover his loss upon the apples so in the orchards, boxed and awaiting shipment.

We find nothing in the principal authorities cited by counsel for defendant, antagonistic to this conclusion. It is, of course, true that before one can claim damages from a common carrier, either for refusing or delaying a shipment, it must appear that a tender was

made of the articles to be shipped, and that the shipper was then ready and able to perform his part of the contract; but what constitutes such tender must depend upon all the circumstances. Elliott, Railroads, §§ 1475–1477; Hutchinson, Carriers (3d Ed.) § 1370; Little Rock v. Conatser, 61 Ark. 560, 561; Wilder v. St. Johnsbury, 66 Vt. 636, 637, 30 Atl. 41.

The Wilder case, above cited, was where an action was brought to recover damages for a refusal by the carrier to transport coal. The plaintiff was the surviving partner of a firm which had been engaged in the coal business and had transported coal over defendant's road. Because of a dispute, the railway company announced that it would not in the future transport coal for this firm. The superintendent of the carrier stated that, if tendered a boat load of coal, he would not take it on or transport it, but would send it back into the lake. A majority of the court held that this did not dispense with the necessity of a tender of the property for transportation; but in the opinion, at page 639 of 66 Vt., and page 41 of 30 Atl., it is said: "It is evident that the case we have is not the case that would have been presented if the conversation relied upon had related to some specific property then upon the line of the defendant's road awaiting shipment, or in transit over a connecting road, or even to some distinct proposal depending upon the defendant's service. It is not necessary to consider what the plaintiff's rights would have been in either of the cases stated."

If just conclusions are to be reached, courts must give practical construction to legal rules and adapt them to commercial customs; and we find here the tender was sufficient as to the apples finally considered by the trial court.

3. No definite destination was fixed by plaintiff for the cars demanded. At most the defendant was notified that the cars were required for shipment to Montana and Eastern points, and because of this fact the defendant claims that the court erred in receiving evidence as to the decline in the market price at various Eastern points, and in permitting evidence that plaintiff intended to ship some of the apples to those points. Early upon the trial, counsel for plaintiff contended that the proper measure of damages was the

difference between the value of the fruit in Washington, when it was offered for shipment, and its value there in November, when the defendant was ready to receive it. Counsel for defendant insisted that such was not the proper measure, but, as we understand their position, that the proper measure would be the difference in the market price at the point of destination, if any such destination had been fixed, but that, inasmuch as no destination had been named by the plaintiff for any of the apples, the difference in the market price at particular Eastern points could not be given. The result of this would be that, while it might be apparent plaintiff had suffered loss, there would be no way by which the amount could be determined.

When a carrier receives goods for shipment it contracts to deliver them within a reasonable time at a certain destination, and if it fails to perform its contract, and loss results to the shipper, the amount of the loss is based upon the value of the property at the point of destination. In this case no contract was entered into. The action was not for a breach of contract, but was, as to the fruit not shipped, in tort for the failure of the defendant to perform a duty resting upon it as a common carrier.

Evidence was received as to the market value in Washington, and also at various Eastern points, upon those different dates. Some of the evidence indicated a general relation between all markets, and that the greatest difference arose from differences in freight charges. But, be this as it may, the defendant cannot complain, as the court in its charge directed the jury, if they found from the evidence " * * * that the apples after November 13 were of greater value at Toppenish and North Yakima than at the said points of destination, then you will adopt that value as a basis for any estimate of decline in prices and resulting damage." The effect was to limit the plaintiff's recovery to a measure which would be most favorable to the defendant; that is, the jury were instructed to take as one extreme the market price at Toppenish and North Yakima when the shipment was tendered, and estimate the loss upon the difference between that price and the highest market price on November 13, whether found to be the highest at Wash-

ington or elsewhere. The learned trial judge gave this instruction, as he explained to the jury, "because, as already stated, the plaintiff is only entitled to recover its actual loss, and any method of computing damage that would give greater than the actual loss or damage would be improper."

We are convinced that what the plaintiff was entitled to was the difference in the actual market value of the apples at the point of shipment at the time they were offered, as disclosed by the testimony, and their actual market value at the same place on November 13 or 15, when the shipping facilities became available. So long as no contract of shipment had been entered into, it is impossible to say what was the point of destination. Indeed, we do not understand from the testimony that any particular destination had been determined upon by the plaintiff for any particular carload of apples. It is a common custom for freight of this character to be sold while actually in transit, and such carloads are constantly diverted from their original destination, so as to get the greatest possible advantage from the markets. The demand by the plaintiff for cars in which to ship its fruit to Montana and Eastern points we have already said was sufficient to make it the duty of the defendant to furnish those cars if reasonably possible; but in the absence of an actual shipment, billed to a particular destination, we think it would be a mere speculation to attempt to say where the fruit would have gone had it actually been shipped. Upon the other hand, the market value of the fruit when offered for shipment at the place where it was could be determined with certainty, as could also its actual market value at the same place on November 15 in its then condition. The difference in those values clearly measured the loss which plaintiff sustained by reason of defendant's default. If, while in the warehouse, the fruit had been destroyed by the wrongful act of some person, the loss would be determined by its value there.

This we understand to have been the original position taken by the plaintiff; but when defendant objected to this evidence, and claimed that the market value at destination must be shown, evidence was introduced showing the market values at different points throughout the United States to which the fruit might have been shipped, had the defendant received it.

4. It remains to consider whether the evidence was sufficient to justify the verdict, if what we have stated to be the true measure of damages be applied. Defendant insists that under the rulings of the court the damages have been duplicated; that by adding the depreciation in market price to the deterioration in condition double damages have been allowed. An examination of the evidence does not sustain this claim, at least to the full extent to which it was made. The testimony in many respects seems conflicting and difficult to reconcile. We have, however, concluded that there was testimony applicable to the measure of damages which we hold proper in this case, and that it is sufficient to sustain a verdict for a reduced amount.

At page 675 of the paper book is found the following testimony by Mr. Gilbert, the president and manager of the plaintiff company: "Q. Did you not testify that the sound value of all your apples at North Yakima on the average was $1.98, or within a cent of that? A. At the time they were ready for shipment? Q. Yes. A. Yes; I think that it was a little less than that, $1.97."

As the prices at Toppenish, North Yakima, and in the orchards were practically the same, we assume that $1.97 per box was the average price of all the apples involved at the time they were offered for shipment, although a computation of other testimony of Mr. Gilbert, in which the prices are given in more detail, indicates an average somewhat lower. At page 722 Mr. Gilbert's testimony is given as follows: "Q. Now, at the risk of repetition, I will ask you to state, if you know, Mr. Gilbert, what was the fair and reasonable wholesale car lot market value of all these different varieties of apples on an average per box in the condition in which they actually were there at Toppenish, referring particularly to 6,730 boxes, marked at Toppenish November 15, 1907, as that condition and appearance of those apples was disclosed to you by your inspection, as shown by your testimony here, at or about that time? A. $1.20 per box. Mr. Hadley: Now, wait. Q. Do you know? A. I do know."

If from $16,476, the amount allowed by the district court upon the motion for a new trial, there is deducted the interest and the damage to the fruit in the five October cars, which would be, disregarding small fractions, $2,753, there would be left $13,723 as the

loss upon 13,729 boxes, or almost exactly an average loss of one dollar per box, while, as said, the average loss claimed in the complaint was eighty cents per box.   But, if the computation be made upon the quoted testimony of Mr. Gilbert, which was directed to what we consider the proper measure of damages, we have a gross loss, both from deterioration and market decline, upon each box of apples at Toppenish warehouse and orchards, of seventy-seven cents per box.   The trial court held there was not sufficient evidence of any deterioration in the 3,900 boxes at North Yakima, the total loss of which, because of decline in North Yakima and Toppenish markets, would be less than sixty-eight cents per box, and is placed on page 34 of respondent's brief at $2,323.75.   In addition, if we allow, as we think we must, the claim of loss upon the five cars shipped in October, we have the following:

| | | |
|---|---:|---:|
| 6,730 boxes in warehouse at Toppenish at 77 cents .... | $ 5,182 | 10 |
| 3,099 boxes in orchards at Toppenish at 77 cents ...... | 2,386 | 23 |
| 3,900 boxes in warehouse at North Yakima .......... | 2,323 | 75 |
| Loss on five cars in October ..................... | 1,716 | 70 |
| | $11,608 | 78 |
| Interest from November 15, 1907, to date of verdict .. | 812 | 61 |
| Total  ............................. | $12,421 | 39 |

It is therefore ordered that the order denying a new trial is reversed, unless the plaintiff, within twenty days after the remittitur from this court is filed in the district court, consents in writing that the verdict be reduced to the sum of $12,421.39, but that, if the plaintiff shall elect to consent to such reduction, the order denying a new trial be affirmed.